UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

FREDY A.,[1]

                    Plaintiff,

        v.

ANDREW SAUL, Commissioner of
Social Security Administration,

                    Defendant.

Case No. 2:20-cv-03327-JC

MEMORANDUM OPINION AND
ORDER OF REMAND

## I.    SUMMARY

On April 9, 2020, plaintiff filed a Complaint seeking review of the Commissioner of Social Security's denial of his application for benefits.  The parties have consented to proceed before the undersigned United States Magistrate Judge.

This matter is before the Court on the parties' cross-motions for summary judgment (respectively, "Plaintiff's Motion" and "Defendant's Motion").  The Court has taken the parties' arguments under submission without oral argument. See Fed. R. Civ. P. 78; L.R. 7-15; Case Management Order ¶ 5.

_____

[1]Plaintiff's name is partially redacted to protect his privacy in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

Based on the record as a whole and the applicable law, the decision of the Commissioner is REVERSED AND REMANDED for further proceedings consistent with this Memorandum Opinion and Order of Remand.

## II.   BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

On August 9, 2016, plaintiff protectively filed an application for Disability Insurance Benefits, alleging disability beginning on June 15, 2015, due to fibromyalgia, spinal impairments, anxiety, post-traumatic stress disorder ("PTSD"), and memory deficits. (See Administrative Record ("AR") 156-57, 172). An Administrative Law Judge ("ALJ") subsequently examined the medical record and heard testimony from plaintiff (who was represented by counsel) and a vocational expert on February 28, 2019. (AR 34-76). On April 16, 2019, the ALJ determined that plaintiff has not been disabled since June 15, 2015, the alleged onset date. (AR 13-29). Specifically, the ALJ found: (1) plaintiff has the following severe impairments: status post-right femur fracture (with residual right leg length shortening), fibromyalgia, osteoarthritis, scoliosis, degenerative disc disease of the cervical and lumbar spine, and generalized anxiety disorder (AR 15-16); (2) plaintiff's impairments, considered individually or in combination, do not meet or medically equal a listed impairment (AR 20); (3) plaintiff retains the residual functional capacity[2] to perform a reduced range of light work[3] (20 C.F.R.

_____

[2]Residual functional capacity is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R. § 404.1545(a)(1).

[3]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Light work also generally "requires a good deal of walking or standing." SSR 83-10, 1983 WL 31251, at *5. Here, the ALJ specifically found plaintiff can perform light work, but is additionally limited to "the use of a single point cane for use on uneven terrain or distance of more than 50 feet from the
(continued...)

§ 404.1567(b)) (AR 21); (4) plaintiff cannot perform any past relevant work (AR 27); (5) plaintiff is capable of performing other jobs that exist in significant numbers in the national economy, specifically "cashier II," "order clerk (food and beverage)," and "lens inserter." (AR 28-29); and (6) plaintiff's statements regarding the intensity, persistence, and limiting effects of subjective symptoms were inconsistent with the medical evidence and other evidence in the record (AR 23).

On February 19, 2020, the Appeals Council denied plaintiff's application for review of the ALJ's decision. (AR 1-3).

**III.   APPLICABLE LEGAL STANDARDS**

**A.   Administrative Evaluation of Disability Claims**

To qualify for disability benefits, a claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012) (quoting 42 U.S.C. § 423(d)(1)(A)) (internal quotation marks omitted), superseded by regulation on other grounds; 20 C.F.R. §§ 404.1505(a), 416.905. To be considered disabled, a claimant must have an impairment of such severity that he is incapable of performing work the claimant previously performed ("past relevant work") as well as any other "work which exists in the national economy." Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)).

To assess whether a claimant is disabled, an ALJ is required to use the five-step sequential evaluation process set forth in Social Security regulations. See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006)

---

[3](...continued)
workstation, occasional postural activities, performance of no more than simple, routine tasks, and performing no driving activities." (AR 21).

(describing five-step sequential evaluation process) (citing 20 C.F.R. §§ 404.1520, 416.920).  The claimant has the burden of proof at steps one through four – *i.e.*, determination of whether the claimant was engaging in substantial gainful activity (step 1), has a sufficiently severe impairment (step 2), has an impairment or combination of impairments that meets or medically equals one of the conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings") (step 3), and retains the residual functional capacity to perform past relevant work (step 4).  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted).  The Commissioner has the burden of proof at step five – *i.e.*, establishing that the claimant could perform other work in the national economy.  Id.

### B.   Federal Court Review of Social Security Disability Decisions

A federal court may set aside a denial of benefits only when the Commissioner's "final decision" was "based on legal error or not supported by substantial evidence in the record."  42 U.S.C. § 405(g); Trevizo v. Berryhill, 871 F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted).  The standard of review in disability cases is "highly deferential."  Rounds v. Comm'r of Soc. Sec. Admin., 807 F.3d 996, 1002 (9th Cir. 2015) (citation and quotation marks omitted).  Thus, an ALJ's decision must be upheld if the evidence could reasonably support either affirming or reversing the decision.  Trevizo, 871 F.3d at 674-75 (citations omitted).  Even when an ALJ's decision contains error, it must be affirmed if the error was harmless.  See Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014) (ALJ error harmless if (1) inconsequential to the ultimate nondisability determination; or (2) ALJ's path may reasonably be discerned despite the error) (citation and quotation marks omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Trevizo, 871 F.3d at 674 (defining "substantial evidence" as "more than a mere scintilla, but less than a preponderance") (citation and quotation marks omitted).  When determining

4

whether substantial evidence supports an ALJ's finding, a court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion[.]" Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (citation and quotation marks omitted).

Federal courts review only the reasoning the ALJ provided, and may not affirm the ALJ's decision "on a ground upon which [the ALJ] did not rely." Trevizo, 871 F.3d at 675 (citations omitted). Hence, while an ALJ's decision need not be drafted with "ideal clarity," it must, at a minimum, set forth the ALJ's reasoning "in a way that allows for meaningful review." Brown-Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015) (citing Treichler, 775 F.3d at 1099).

A reviewing court may not conclude that an error was harmless based on independent findings gleaned from the administrative record. Brown-Hunter, 806 F.3d at 492 (citations omitted). When a reviewing court cannot confidently conclude that an error was harmless, a remand for additional investigation or explanation is generally appropriate. See Marsh v. Colvin, 792 F.3d 1170, 1173 (9th Cir. 2015) (citations omitted).

## IV.   DISCUSSION

Plaintiff claims that the ALJ erred in assessing the medical opinions regarding plaintiff's physical and mental impairments. (Plaintiff's Motion at 9-23). For the reasons stated below, the Court finds that the ALJ erred on this basis. Since the Court cannot find that the error was harmless, a remand is warranted.[4]

### A.   Pertinent Law

In Social Security cases, the amount of weight given to medical opinions generally varies depending on the type of medical professional who provided the

---

[4]After a brief account of the pertinent law, the Court first addresses the medical opinions regarding plaintiff's physical impairments, followed by the opinions regarding mental impairments. Because remand is warranted for reconsideration of these opinions, as noted below, other issues raised in Plaintiff's Motion are not substantially addressed.

opinions, namely "treating physicians," "examining physicians," and "nonexamining physicians." 20 C.F.R. §§ 404.1527(c)(1)-(2) & (e), 404.1502, 404.1513(a); 20 C.F.R. §§ 416.927(c)(1)-(2) & (e), 416.902, 416.913(a); Garrison, 759 F.3d at 1012 (citation and quotation marks omitted).  A treating physician's opinion is generally given the most weight, and may be "controlling" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record[.]"  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (citation omitted).  In turn, an examining, but non-treating physician's opinion is entitled to less weight than a treating physician's, but more weight than a nonexamining physician's opinion.  Garrison, 759 F.3d at 1012 (citation omitted).

A treating doctor's opinion, however, is not necessarily conclusive as to either a physical or mental condition or the ultimate issue of disability.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted).  An ALJ may reject the uncontroverted opinion of a treating source by providing "clear and convincing reasons that are supported by substantial evidence" for doing so.  Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citation omitted).  Where a treating source's opinion is contradicted by another doctor's opinion, an ALJ may reject such opinion only "by providing specific and legitimate reasons that are supported by substantial evidence."  Garrison, 759 F.3d at 1012 (citation and footnote omitted).

An ALJ may provide "substantial evidence" for rejecting a medical opinion by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  Garrison, 759 F.3d at 1012 (citing Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)) (quotation marks omitted).  An ALJ must provide more than mere "conclusions" or "broad and vague" reasons for rejecting a treating or examining

1  doctor's opinion.  See McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989)

2  (citation omitted).  "[The ALJ] must set forth his own interpretations and explain

3  why they, rather than the [doctor's], are correct."  Embrey v. Bowen, 849 F.2d 418,

4  421-22 (9th Cir. 1988).

5    **B.    The ALJ Erred in Assessing the Medical Opinions Regarding**

6        **Physical Impairments**

7      **1.    Opinions**

8      The record includes medical opinions from (1) Charles Weidmann, M.D.,

9  plaintiff's treating rheumatologist; (2) Magued R. Fadly, M.D., his treating pain

10  management specialist; (3) Eliza Ahn, M.D., his treating primary care physician;

11  (4) Michael Wallack, M.D., the consultative examining physician; and

12  (5) F. Greene, M.D., the state agency reviewing consultant.  Each of these is

13  summarized in turn below.

14      Dr. Weidmann treated plaintiff every month between May 2013 and January

15  2019, primarily for fibromyalgia and lower back pain.  (See AR 1243, 1251).  He

16  provided two overall assessments in the record.  (AR 1243-46, 1250-53).  In the

17  first, dated March 18, 2015 (before the alleged onset date), Dr. Weidmann

18  indicated that plaintiff experienced diffuse myalgias, fatigue, and poor

19  concentration with flare ups (AR 1251), and opined that plaintiff would be

20  incapacitated for one to two days at a time, up to five times per month (AR 1252).

21  Dr. Weidmann further noted that for the next year, plaintiff would need a reduced

22  work schedule of four to eight hours per day, four days per week.  (AR 1252).

23      In Dr. Weidmann's later assessment, dated November 15, 2018, he wrote

24  that plaintiff "is never pain free," and that the pain is diffuse and is "sometimes

25  worse at upper [and] lower back regions," with "[n]o definite triggers," though he

26  "[f]eels worse with increased stress."  (AR 1243).  Dr. Weidmann stated plaintiff

27  uses a cane to ambulate and has limited range of motion in the neck, arms, waist,

28  and hips.  (AR 1243, 1245).  He opined that plaintiff can sit for about two hours

total in an eight-hour workday, up to one hour at a time; that he can stand or walk for less than two hours in an eight-hour day, with standing limited to thirty minutes at a time; and that he needs to take numerous unscheduled 30-40 minute breaks due to pain, fatigue, and weakness. (AR 1244). Dr. Weidmann further opined that plaintiff has significant limitations with reaching, handling, and fingering; that he can rarely carry less than ten pounds, twist, stoop, or climb stairs; and that he can never crouch, squat, or climb ladders. (AR 1245). He also indicated that plaintiff cannot handle even low stress work and would be off task 25% or more of the workday. (AR 1246).

Dr. Fadly provided pain management treatment at least monthly between April 2016 and December 2018. (AR 741-55, 1341-57). On February 19, 2019, Dr. Fadly completed a medical source statement indicating plaintiff is limited to sitting for less than two hours in an eight-hour workday, for forty-five minutes at a time; and standing or walking for less than two hours in an eight-hour day, with standing limited to ten minutes at a time. (AR 1342). Dr. Fadly further opined that plaintiff uses a cane to walk, needs unscheduled breaks, and has significant limitations with reaching, handling, and fingering. (AR 1343). In addition, Dr. Fadly noted plaintiff can never lift and carry ten pounds; can never twist, stoop, crouch, squat, or climb ladders; and can rarely climb stairs. (AR 1343). Dr. Fadly indicated plaintiff is incapable of even low stress work, would be off task 25% or more of the workday, and would miss more than four days of work per month. (AR 1344).

Dr. Ahn has served as plaintiff's primary care provider since 2013. (AR 880). In a medical source statement completed on November 17, 2018, she noted that plaintiff's symptoms include fatigue, depression, low back pain and spasms, flat affect, palpitations, and bronchial wheezing. (AR 880). Dr. Ahn opined plaintiff is limited to sitting for less than two hours in an eight-hour workday, for fifteen minutes at a time; standing or walking for less than two hours, with

standing limited to twenty minutes at a time; and lifting and carrying twenty pounds occasionally and ten pounds frequently.  (AR 881-82).  She also noted plaintiff needs to use a cane; has significant limitations with reaching, handling, and fingering; can rarely twist, stoop, or climb stairs; and can never crouch, squat, or climb ladders.  (AR 882).  Dr. Ahn further opined plaintiff can handle low stress work, but would be off task 25% or more of the workday, and would miss more than four days of work per month.  (AR 883).

Dr. Wallack performed a consultative examination on January 19, 2017.  (AR 440-45).  He noted diffuse tenderness and decreased range of motion of the back and right hip, and slow limping gait.  (AR 443-44).  His diagnostic impression included "[d]iffuse pain of several years involving the back, neck, shoulders, arms, and hands allegedly fibromyalgia [sic]"; "[l]ow back pain residual motor vehicle accident in July 2016 [sic]"; hyperlipidemia; and hypertension.  (AR 444).  He assessed a capacity for a reduced range of light work, including the ability to sit without restriction; stand or walk for six hours in an eight-hour day; lift or carry up to twenty pounds; and perform occasional climbing, balancing, and stooping.  (AR 444-45).

Dr. Greene, the state agency consultant, reviewed the record on January 27, 2017, and assessed an ability to stand, walk, or sit for six hours in an eight-hour day; to lift up to twenty pounds occasionally and ten pounds frequently, and to perform occasional climbing, balancing, and stooping.  (AR 86-87).

## 2.    ALJ's Assessment of Opinions Regarding Physical Impairments

The ALJ gave "minimal weight" to the treating opinions of Dr. Weidmann and Dr. Fadly on the grounds that the opinions were "generally inconsistent with their mild clinical findings, the clinical findings of other treating and examining medical sources, the degree of treatment, the inconsistencies in statements about treatment effectiveness, and [plaintiff's] own descriptions in the record of his daily

1  activities."[5] (AR 25, 26).  The ALJ stated that Dr. Weidmann and Dr. Fadly
2  "appear to have taken [plaintiff's] subjective allegations at face value and merely
3  reiterated those allegations in their reports and when making their assertions
4  regarding [plaintiff's] ability to work."  (AR 26).

5      The ALJ found, moreover, that Dr. Weidmann provided inconsistent
6  statements about the effectiveness of injection treatments.  (AR 25).  Specifically,
7  the ALJ stated that in 2017 Dr. Weidmann "provided several trigger point
8  injections and noted that medications provided some pain relief, but then stated a
9  month later that no treatments had provided pain relief."  (AR 25).  Yet, according
10 to the ALJ, Dr. Weidmann continued to administer the injections in 2017, 2018,
11 2019.  (AR 25).  The ALJ found it "questionable that Dr. Weidmann would
12 continue to provide such injections if they were wholly ineffectual as he earlier
13 claimed."  (AR 25).

14     In addition, the ALJ found Dr. Weidmann's statements about plaintiff's
15 "intractable pain" were inconsistent with the record because, according to the ALJ,
16 plaintiff "was actually taken off narcotic pain medication as of late 2017 and only
17 treated with Ibuprofen."  (AR 25).  The ALJ remarked, moreover, that plaintiff
18 "has not required surgery, displayed any neurological deficits or radicular pain
19 signs and has only received conservative treatments in the form of medications and
20 injections."  (AR 24).

21     Regarding the clinical evidence, the ALJ remarked that Dr. Weidmann's
22 findings were "mild at best (e.g. diffuse tenderness and trigger points)," and his
23 clinical findings after plaintiff's alleged onset date "showed no apparent
24 deterioration or aggravation of his physical condition or pain complaints."  (AR
25 24).  Similarly, the ALJ noted that plaintiff "showed no significant changes in his

26

27     [5]The ALJ did not mention or assess Dr. Ahn's treating opinion.  The ALJ acknowledged
   and rejected Dr. Ahn's 2019 prescription of a walker and diagnosis of muscular dystrophy, but
28 otherwise ignored Dr. Ahn's assessment.  (AR 25).

1   clinical presentation during visits with Dr. Fadly in 2017 and 2018." (AR 25).
2   The ALJ found that plaintiff's "medical records following his alleged onset date
3   reflect little more than treatment for various, transitory health issues," and also that
4   "updated diagnostic scans showed no significant changes in the claimant's spinal
5   condition." (AR 24). Specifically, the ALJ also noted that a cervical spine MRI
6   from August 2015, after the alleged onset date, "showed only a small disc bulge at
7   the C4-5 level." (AR 24). Indeed, the ALJ found there was "no evidence of any
8   particular injury or trauma" corresponding with plaintiff's alleged onset date in
9   July 2015. (AR 24). Though plaintiff alleged that he was in a car accident at that
10  time, the ALJ asserted there were "no records associated with such an accident
11  (e.g. emergency room records, etc.)." (AR 24).

12      The ALJ gave "greater weight to Dr. Wallack's assessment insofar as it
13  appears most consistent with his own clinical findings, the other clinical and
14  diagnostic findings in the record, and the degree of treatment." (AR 25). The ALJ
15  noted that plaintiff "generally performed well during Dr. Wallack's 2017
16  examination, showing only mild deficits of back motion and diffuse tenderness,
17  and ability to ambulate independently without an assistive device despite a shorter
18  right leg." (AR 24). The ALJ also gave greater weight to the opinion of the state
19  agency reviewing consultant. (AR 27).

20      Based on the ALJ's review of the record regarding plaintiff's physical
21  impairments, as noted above, he determined plaintiff had the residual functional
22  capacity to perform light work – which is work that involves occasionally lifting
23  up to twenty pounds and frequently lifting or carrying up to ten pounds, 20 C.F.R.
24  § 404.1567(b), as well as generally "a good deal of walking or standing," SSR 83-
25  10 – but with additional limitations to "the use of a single point cane for use on
26  uneven terrain or distance of more than 50 feet from the workstation, [and]
27  occasional postural activities." (AR 21).
28  ///

### 3.   Analysis

The ALJ failed to provide specific and legitimate reasons to discount the treating opinions of Dr. Weidmann, Dr. Fadly, and Dr. Ahn.  With respect to Dr. Ahn, the ALJ erred by failing to discuss and assess her opinion of plaintiff's limitations, thus leaving it unclear whether the opinion was actually considered and, if so, why it was not given greater weight.  As for Dr. Weidmann and Dr. Fadly, whose similar opinions appear to have been rejected on essentially the same grounds, the ALJ's assessment rests on several errors and unreasonable determinations of the facts in the record.

First, the ALJ erred by stating that plaintiff "was actually taken off narcotic pain medication as of late 2017 and only treated with Ibuprofen." (AR 25).  To the contrary, treatment records show that after 2017 and throughout the relevant period, plaintiff's physicians continued to prescribe strong narcotic pain medications, including a fentanyl patch (see. e.g., AR 1188-91, 1204-05, 1214-15), which is a "heavy duty medication prescribed for chronic pain," and "is not prescribed willy-nilly as there are serious potential side effects."  Molter v. Astrue, 2010 WL 2348738, at *5 (E.D. Cal. June 8, 2010); see also Centers for Disease Control and Prevention (CDC), Fentanyl, https://www.cdc.gov/drugoverdose/opioids/fentanyl.html (last accessed March 28, 2021) (explaining that pharmaceutical fentanyl is a "synthetic opioid, approved for treating severe pain," and is "50 to 100 times more potent than morphine").

Indeed, to the extent that the ALJ discounted the treating physicians' opinions based on finding that they were inconsistent with the "degree of treatment" provided (AR 25), that finding is not supported by the record.  The record instead reflects frequent injections and pain medications such as Norco and fentanyl, as well as a TENS unit.  (See, e.g., AR 1189, 1191).  These are not conservative treatments for fibromyalgia, and the ALJ failed to identify any more aggressive treatments that were available.  See Revels, 874 F.3d at 667

12

1    (fibromyalgia treatment consisting of a variety of prescription medications and

2    steroid injections is not conservative); Trejo v. Berryhill, 2018 WL 3602380, at

3    *15 (C.D. Cal. July 25, 2018) ("Fibromyalgia is treated with medications and

4    self-care, rather than surgery or other more radical options.") (quotations and

5    citations omitted); see also Calleres v. Comm'r of Soc. Sec., 2020 WL 4042904 at

6    *5 (E.D. Cal. July 17, 2020) (claimant's treatment was not a clear and convincing

7    reason for discounting testimony where the ALJ did not identify any additional

8    "treatment that is available for such impairments, especially fibromyalgia, that the

9    [claimant] did not use"); Candice C. v Saul, 2019 WL 5865610 at *4 (C.D. Cal.

10   Nov. 8, 2019) (ALJ erred where he "failed to explain why [the treatment] is routine

11   or conservative or what more aggressive treatment was available and appropriate

12   for Plaintiff").

13       The ALJ also unreasonably construed the record in determining that Dr.

14   Weidmann was "inconsistent in his references to [plaintiff's] degree of pain and

15   relief from treatment modalities." (AR 25). According to the ALJ, Dr. Weidmann

16   noted in 2017 that the trigger point injections provided some relief, then indicated

17   a month later that no treatments relieved plaintiff's pain, and yet continued to

18   administer the injections. The ALJ found it "questionable that Dr. Weidmann

19   would continue to provide such injections if they were wholly ineffectual as he

20   earlier claimed." (AR 25). However, a review of the treatment records

21   demonstrates that plaintiff's injections and other treatments provided varying

22   degrees of temporary pain relief, but had no lasting benefit and did not improve

23   plaintiff's overall ability to function. (See, e.g. AR 388, 866, 1196, 1208). Thus,

24   in a March 15, 2017 letter, Dr. Weidmann wrote that plaintiff had received a total

25   of sixteen trigger point injections, but plaintiff "unfortunately did not respond as

26   well to the injections as we had hoped." (AR 871). Rather, plaintiff "continue[d]

27   with diffuse myalgias and other symptoms related to his fibromyalgia and [was]

28   being somewhat controlled on prescription medication." (AR 871). About a

13

1   month later, on April 5, 2017, Dr. Weidmann wrote that plaintiff "has been treated

2   with trigger point injections and oral medication[,] all of which have been without

3   benefit.  He has tried and failed returning to work with restrictions and

4   accommodations and was unable to perform job duties."  (AR 873).  Dr.

5   Weidmann did not state that the injections were "wholly ineffectual" (AR 25), nor

6   is that a reasonable interpretation of his statements in light of the record.  The ALJ

7   failed to adequately explain how Dr. Weidmann's continued use of injections for

8   treatment undermined his opinions in any respect.

9        In addition, the ALJ erred by asserting that Dr. Weidmann and Dr. Fadly

10  "appear to have taken [plaintiff's] subjective allegations at face value and merely

11  reiterated those allegations in their reports and when making their assertions

12  regarding [plaintiff's] ability to work."  (AR 26).  First, the ALJ failed to identify

13  anything in the treatment records or medical opinions indicating that the opinions

14  were based heavily on plaintiff's reports.  See Ghanim v. Colvin, 763 F.3d 1154,

15  1162 (9th Cir. 2014) ("[W]hen an opinion is not more heavily based on a patient's

16  self-reports than on clinical observations, there is no evidentiary basis for rejecting

17  the opinion.") (internal quotation and citations omitted).  Moreover, the ALJ failed

18  to take into account that fibromyalgia is assessed "entirely on the basis of patients'

19  reports of pain and other symptoms."[6]  Benecke v. Barnhart, 379 F.3d 587, 590

20

21  _____

22      [6]Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective
    tissue components of muscles, tendons, ligaments, and other tissue."  Benecke v. Barnhart, 379

23  F.3d 587, 589 (9th Cir. 2004).  Typical symptoms include "chronic pain throughout the body,
    multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate

24  the cycle of pain and fatigue associated with this disease."  Id. at 590.  The Agency has provided
    two sets of criteria for diagnosing the condition, which basically involve finding that the patient

25  has experienced widespread pain, the manifestation of particular symptoms associated with
    fibromyalgia – such as fatigue, depression, or the presence of certain points of tenderness – and

26  the absence of other disorders that would account for the pain.  See SSR 12-2p, at *2-3; Revels,
    874 F.3d at 656-57.  The Agency's regulations also urge ALJs to consider "a longitudinal record

27  whenever possible" because "the symptoms of fibromyalgia 'wax and wane,' and . . . a person
    may have 'bad days and good days.'"  Revels, 874 F.3d at 657 (quoting SSR 12-2p)).

28

(9th Cir. 2004); see also Sayers v. Saul, 797 F. App'x 384, 385 (9th Cir. 2020) ("To the extent the patient's symptoms are caused by fibromyalgia, the ALJ must assess the patient's self-reporting of those symptoms in light of the fibromyalgia diagnosis.") (citing Revels, 874 F.3d at 662; Benecke, 379 F.3d at 594).  For that reason, to the extent that the ALJ rejected the assessments of plaintiff's fibromyalgia-related limitations based on self-reporting or a lack of diagnostic evidence (see AR 24), it was improper to do so without taking into account the unique nature of this condition.  See Revels, 874 F.3d at 662 ("In evaluating whether a claimant's residual functional capacity renders them disabled because of fibromyalgia, the medical evidence must be construed in light of fibromyalgia's unique symptoms and diagnostic methods[.]"); see also id. at 656-57 (noting that those suffering from fibromyalgia have normal muscle strength, sensory functions, and reflexes, and diagnosis "does not rely on X-rays or MRIs"); Benecke, 379 F.3d at 590 ("[T]here are no laboratory tests to confirm the diagnosis.").

The ALJ also appears to have discounted the treating physicians' assessments in part because the ALJ found "no evidence of any particular injury or trauma" corresponding with plaintiff's alleged onset date in July 2015.  (AR 24). In particular, though plaintiff alleged that he was in a car accident at that time, the ALJ asserted there were "no records associated with such an accident (e.g. emergency room records, etc.)."  (AR 24).  The ALJ also noted that a cervical spine MRI from August 2015, after the alleged onset date, "showed only a small disc bulge at the C4-5 level."  (AR 24; see AR 318).  However, as plaintiff points out, the record does in fact contain emergency room records from the car accident, dated July 13, 2015, reflecting moderate injuries to plaintiff's face, neck, back, and abdomen.  (AR 611-19).  Plaintiff testified that his fibromyalgia symptoms worsened after this accident (AR 43), and that is consistent with the treatment notes which reflect increased pain and symptoms.  (See AR 386, 391, 399). Moreover, it is not as though plaintiff had no difficulty working before that.  To the

1   contrary, the record reflects that plaintiff had varying difficulty sustaining full-time

2   work due to his fibromyalgia and other conditions in the years prior to the accident.

3   (See, e.g., AR 344, 353, 361, 385).  Therefore, except to determine when the

4   disability period should begin, it is inconsequential whether the July 2015 accident

5   itself marked a dramatic change in plaintiff's impairments and functional abilities,

6   so long as plaintiff is able to demonstrate that his impairments prevented him from

7   sustaining gainful employment during the relevant period and for a duration lasting

8   or expected to last at least twelve months.  See Molina, 674 F.3d at 1110 ("For

9   purposes of the Social Security Act, a claimant is disabled if the claimant is unable

10  'to engage in any substantial gainful activity by reason of any medically

11  determinable physical or mental impairment which can be expected to result in

12  death or which has lasted or can be expected to last for a continuous period of not

13  less than 12 months.'") (quoting 42 U.S.C. § 423(d)(1)(A)).

14          Finally, the ALJ also erred in discounting the opinions of Dr. Weidmann and

15  Dr. Fadly on the basis that they were inconsistent with plaintiff's "own

16  descriptions in the record of his daily activities." (AR 25).  The ALJ gave no

17  indication how their treating medical opinions conflicted with any of plaintiff's

18  activities, and the record does not seem to support any such conflict.  Indeed, the

19  only "activities" that the ALJ acknowledged in the decision are that plaintiff

20  "spends most of his time resting or watching television," that he can manage his

21  finances, and that he can drive but does so only when no one else is available to

22  drive him.  (AR 22-23).  Otherwise, as the ALJ noted, plaintiff stated he has

23  difficulty performing self-care tasks, he cannot "hike, shave, or get in and out of

24  the shower without assistance," and he is "unable to perform any yard work,

25  cooking or household chores."  (AR 22-23).

26          Accordingly, the ALJ failed to provide specific and legitimate reasons for

27  giving minimal weight to the treating opinions of Dr. Weidmann, Dr. Fadly, and

28  Dr. Ahn.  Remand is warranted for reconsideration of these opinions.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.    The ALJ Erred in Assessing the Medical Opinions Regarding Mental Impairments**

**1.    Opinions**

The record includes medical opinions from (1) Mark Sergi, Ph.D., plaintiff's treating psychologist; (2) Allan S. Abrams, M.D., his treating psychiatrist; (3) Edward Ritvo, M.D., the psychiatric consultive examiner; and (4) Norman Zukowsky, Ph.D., the state agency reviewing consultant.  Each of these is summarized in turn below.

Dr. Sergi provided cognitive behavioral therapy about once a month beginning in October 2017.  (AR 1368).  On March 2, 2019, Dr. Sergi completed a mental impairment questionnaire indicating that plaintiff's symptoms included a "depressed mood, suicidal ideations, social withdrawal, fear/anxiety when driving, paranoia (lack of sleep), [and] hallucinations (lack of sleep)."  (AR 1368).  He opined plaintiff has "serious" limitations in most mental abilities and aptitudes needed to do unskilled, semiskilled, and skilled work.  (AR 1370-71).  Dr. Sergi further opined that plaintiff has an extreme limitation in activities of daily living, a marked limitation in maintaining social functioning, and a marked limitation in maintaining concentration, persistence or pace.  (AR 1372).  He indicated plaintiff would likely be absent from work more than four days per month.  (AR 1373).

Dr. Abrams treated plaintiff about once or twice a month beginning in October 2018.  (AR 1334).  He completed a mental impairment questionnaire on February 15, 2019, indicating that plaintiff's diagnoses included chronic PTSD, steroid-induced psychosis, anxiety, depression, and paranoia, with clinical findings including "intermittent disorientation, auditory [and] visual hallucinations, impaired ambulation, [and] intermittent cognition."  (AR 1334).  Dr. Abrams opined that plaintiff is at least "seriously limited" in all the specified mental abilities and aptitudes needed to do unskilled work; and that he has "marked" limitations in activities of daily living, maintaining social functioning, and

1    maintaining concentration, persistence or pace.  (AR 1336-37).  He noted that
2    impairments or treatment would cause plaintiff to be absent from work more than
3    four days per month.  (AR 1338).

4            Dr. Ritvo performed a consultative examination on January 23, 2017.  (AR
5    453-57).  He noted plaintiff has generalized anxiety disorder and opined that
6    plaintiff has no limitation in understanding, remembering, or completing simple
7    commands.  (AR 456-57).  He also opined plaintiff is mildly impaired in
8    understanding or remembering complex commands; interacting appropriately with
9    supervisors, coworkers, or the public; responding to changes in the normal
10   workplace setting; and maintaining persistence and pace in a normal workplace
11   setting.  (AR 457).

12           On February 16, 2017, Dr. Zukowksy reviewed the record and assessed only
13   mild limitations.  (AR 84).

14                   **2.     ALJ's Assessment of Opinions Regarding Mental**
15                          **Impairments**

16           The ALJ gave "minimal weight" to Dr. Abrams's treating opinion, which the
17   ALJ found to be "wholly inconsistent with [Dr. Abrams's] minimal clinical
18   findings, [plaintiff's] own statements, the other clinical findings in the record and
19   the mild degree of mental health treatment."  (AR 26).  As with the other treating
20   opinions, the ALJ stated that Dr. Abrams "appears to have taken [plaintiff's]
21   subjective allegations at face value and merely reiterated those allegations in [his]
22   report[] and when making [his] assertions regarding [plaintiff's] ability to work."
23   (AR 26).

24           The ALJ determined there was "no evidence [plaintiff] has required inpatient
25   psychiatric treatment or has participated in ongoing, outpatient mental health
26   therapy and no evidence of any psychiatric issues corresponding to his alleged
27   onset date."  (AR 25).  While the ALJ acknowledged that plaintiff later received
28   outpatient mental health treatment with Dr. Sergi and Dr. Abrams, the ALJ found

                                        18

1  that their treatment notes "reflect little more than [plaintiff's] subjective complaints

2  without any indication of intensive treatment or significant clinical findings."[7]

3  (AR 26).

4       The ALJ also found plaintiff was "highly inconsistent regarding his reported

5  [psychiatric] symptoms, particularly in his statements about experiencing

6  hallucinations." (AR 25). The ALJ found that plaintiff's statements about

7  hallucinations were inconsistent because plaintiff "denied any such problems to Dr.

8  Ritvo and denied any prior mental health treatment." (AR 25-26). In addition, the

9  ALJ noted that when plaintiff initially presented with these complaints of

10  hallucinations, at West Hills Hospital in August 2018, plaintiff also tested positive

11  for marijuana (THC) and opiates, and left the hospital early against medical advice.

12       Based on the ALJ's review of the record regarding plaintiff's mental

13  impairments, as noted above, he determined plaintiff had the residual functional

14  capacity to perform "no more than simple, routine tasks," and "no driving

15  activities." (AR 21).

16          **3.**   **Analysis**

17       The ALJ failed to provide specific and legitimate reasons to discount the

18  treating opinions of Dr. Abrams and Dr. Sergi. While the ALJ failed to

19  specifically address Dr. Sergi's treating opinion, the ALJ's assessment of Dr.

20  Abrams's opinions rests on several significant errors.

21       First, the ALJ erred by finding, in his assessment of the medical opinions,

22  that plaintiff's statements about experiencing hallucinations were inconsistent

23  because plaintiff "denied any such problems to Dr. Ritvo and denied and prior

24  mental health treatment." (AR 25-26). Plaintiff was examined by Dr. Ritvo in

25  January 2017. (AR 453-57). At that time, plaintiff's first mental health treatment

26

27

28      [7]Aside from this remark, the ALJ did not mention or assess Dr. Sergi's treating opinion, as noted below.

(with Dr. Sergi), was still about ten months in the future, and he would not experience his first hallucinations until the following year.  (See AR 474-85, 1196, 1368).  Thus, contrary to the ALJ's assertion, plaintiff's denial of psychotic symptoms and prior mental health treatment to Dr. Ritvo in January 2017 was perfectly consistent with plaintiff's statements about these issues.

The ALJ also appears to have rejected plaintiff's allegations of hallucinations because when plaintiff initially presented with these complaints, at West Hills Hospital in August 2018, plaintiff "was noted to test positive for marijuana and opioids (despite having previously been discontinued on such medications) and left against medical advice prior to evaluation or treatment."  (AR 26; see AR 474-85).  However, the ALJ failed to acknowledge plaintiff's explanations for these facts.  For example, contrary to the ALJ's remark that plaintiff had "been discontinued on such medications," plaintiff was prescribed the opioid medications Norco and fentanyl during that time (see AR 475, 1188-89, 1193-94, 1201-02, 1204-05).  As for the positive marijuana test, plaintiff explained at the hearing that he had been using (and has since discontinued) a CBD inhaler as treatment to increase his appetite, and he had been told that the inhaler contained only a "small amount" of THC, though he did not know how much.[8]  (AR 57-60). Regarding plaintiff's premature check-out, treatment records from the incident reflect that plaintiff left the hospital before receiving further inpatient treatment as recommended because he "prefer[red] to have workup don[e] outpatient and has financial concerns as he is still paying off last admission bill."  (AR 482).  To the extent plaintiff may have discontinued treatment for financial reasons, it is improper for the ALJ to hold this against plaintiff.  Cf. Orn v. Astrue, 495 F.3d 625, 638 (9th Cir. 2007) ("[D]isability benefits may not be denied because of the

---

[8]Although the ALJ may indeed have found this explanation did not credibly account for the positive THC test, the ALJ's failure to even acknowledge the explanation leaves it unclear whether it was in fact rejected or simply overlooked.

1  claimant's failure to obtain treatment he cannot obtain for lack of funds.") (quoting
2  Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995)).  Moreover, consistent with
3  plaintiff's explanation for refusing further inpatient treatment at the hospital,
4  plaintiff did in fact begin outpatient psychiatric treatment soon after, with Dr.
5  Abrams.  (See AR 1196, 1334, 1358-67).

6       While the ALJ acknowledged plaintiff's mental health treatment with Dr.
7  Sergi and Dr. Abrams, the ALJ found that these treatments "reflect little more than
8  [plaintiff's] subjective complaints without any indication of intensive treatment or
9  significant clinical findings." (AR 26).  The ALJ thus rejected Dr. Abrams's
10 opinion in part because he found that the treating psychiatrist "appears to have
11 taken [plaintiff's] subjective allegations at face value and merely reiterated those
12 allegations" in the opinion of plaintiff's mental limitations.  (AR 26).  However, as
13 noted above, it is improper for an ALJ to rely on this basis when the opinion at
14 issue "is not more heavily based on a patient's self-reports than on clinical
15 observations."  Ghanim, 763 F.3d at 1162.  Here, the ALJ failed to demonstrate
16 that Dr. Abrams's opinion was based more heavily on self-reports and clinical
17 observations, particularly where the opinion does seem to address Dr. Abrams's
18 own observations, diagnoses, and treatments.  (AR 1334, 1336); see Ghanim, 763
19 F.3d at 1162 (substantial evidence did not support finding that providers' opinions
20 were largely based on self-reports where the ALJ "offered no basis for his
21 conclusion that these opinions were based more heavily on [the claimant's]
22 self-reports," and the treating providers' opinions "discuss[ed] the providers'
23 observations, diagnoses, and prescriptions, in addition to [the claimant's]
24 self-reports").

25      Finally, the ALJ erred by rejecting Dr. Abrams's opinion based on plaintiff's
26 "mild degree of mental health treatment."  (AR 26).  In addition to receiving
27 mental health therapy since October 2018, plaintiff also has been prescribed
28 medications such as Xanax, Lexapro, and Seroquel.  (See AR 1199, 1334).  The

1   ALJ failed to demonstrate how this treatment was "mild" or otherwise inconsistent

2   with the treating medical opinions.  See Matthews v. Astrue, 2012 WL 1144423, at

3   *9 (C.D. Cal. Apr. 4, 2012) (claimant's care was not conservative because although

4   claimant was not hospitalized, he received outpatient care and took psychotropic

5   medication); see also Childers v. Berryhill, 2019 WL 1474030, at *8 (D. Nev. Mar.

6   12, 2019) ("Seroquel is a strong psychiatric medication. Numerous courts

7   specifically have recognized that the prescription of Seroquel connotes mental

8   health treatment which is not conservative, within the meaning of social security

9   jurisprudence.") (alterations, quotations, and citations omitted), report and

10  recommendation adopted, 2019 WL 1473367 (D. Nev. Apr. 3, 2019)).

11       Accordingly, the ALJ failed to provide specific and legitimate reasons to

12  reject the opinions of Dr. Abrams and Dr. Sergi.  Remand is warranted for

13  reconsideration of these opinions.[9]

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  _____

24       [9]Among other contentions, plaintiff also argues that the ALJ erred in discounting his

25  subjective statements and testimony.  (See Plaintiff's Motion at 23-30).  Because the ALJ's
    assessment of plaintiff's statements largely rests on at least some of the same improper grounds

26  addressed above with respect to the treating medical opinions, plaintiff's statements and
    testimony should also be reassessed on remand.  Otherwise, the Court need not, and has not

27  adjudicated plaintiff's other challenges to the ALJ's decision, except insofar as to determine that
    a reversal and remand for immediate payment of benefits would not be appropriate based

28  thereon.

1

**V.      CONCLUSION**

2

         For the foregoing reasons, the decision of the Commissioner of Social

3

Security is REVERSED and this matter is REMANDED for further administrative

4

action consistent with this Opinion.[10]

5

         LET JUDGMENT BE ENTERED ACCORDINGLY.

6

DATED: April 1, 2021

7

                                        _____
                                                       /s/

8

                                        Honorable Jacqueline Chooljian
                                        UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

   _____

25

         [10]When a court reverses an administrative determination, "the proper course, except in

26

rare circumstances, is to remand to the agency for additional investigation or explanation."
Immigration & Naturalization Service v. Ventura, 537 U.S. 12, 16 (2002) (citations and

27

quotations omitted); Treichler, 775 F.3d at 1099 (noting such "ordinary remand rule" applies in
Social Security cases) (citations omitted). The Court has determined that a reversal and remand

28

for immediate payment of benefits would not be appropriate.

23